E-FILED on      7/19/06

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAUL NORMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | No. C-05-02059 RMW<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 17, 22]** |

Plaintiff Paul Norman ("Norman") has sued the United States of America for a tax refund in the amount of $11,023. Norman moves for summary judgment. The United States cross-moves for summary judgment. The court has read the moving and responding papers and considered counsels' arguments. For the reasons set forth below, the court grants the United States' motion and denies Norman's motion.

## I. BACKGROUND

Norman worked for Network Appliance, Inc. ("Network") from 1999 to 2003. Norman Decl. Supp. Mot. Summ. J. ("Norman Decl.") ¶ 2. Network granted Norman employee incentive stock options ("ISOs") in his compensation package. *Id*. at ¶ 3. Norman claims that, during the 1999 tax year, he had a positive Alternative Minimum Tax ("AMT") adjustment from the exercise of his ISOs in the amount of $131,294.50. *Id*. He contends that, during the 2000 tax year, he had (1) a positive

AMT adjustment from the exercise of his ISOs of $5,099,869.25, (2) a negative AMT adjustment from disqualified dispositions of shares of $460,504.20, and (3) a negative AMT adjustment stemming from a regular tax gain from the sale of his shares in the amount of $3,443.46. *Id*. at ¶ 4. He asserts that he sold 85,198 Network shares during the 2001 tax year. According to Norman, this resulted in a negative AMT adjustment of $3,523,735.10 and a further AMT loss of $1,038,362.20 as a result of his regular gain. *Id*. at ¶ 5. His 2001 federal income tax return originally reported $822,807 in taxable income and $11,023 in tax. Weill Decl. Supp. Cross-Mot. Summ. J. ("Weill Decl.") Ex. 1. On October 11, 2004 he filed an amended return reporting $824,221 in taxable income but no tax due. Weill Decl. Ex. 2. The amended return reflects AMT Negative Adjustments in the amount of $4,621,500. *Id*. The IRS took no action on his refund. On May 19, 2005 he filed a complaint in this court.

## II. ANALYSIS

### A. Summary Judgment

28 U.S.C. § 1346(a)(1) entitles a taxpayer to bring "a civil action against the United States for the recovery of any internal-revenue tax" that he believes was erroneously assessed. Ordinary summary judgment standards apply. *See Flintkote Co. v. U.S.*, 7 F.3d 870, 871 (9th Cir. 1993). Summary judgment is therefore proper when there are no genuine issues as to any material fact and the movant is entitled judgment as a matter of law. *See* Fed. R. Civ. Proc. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In any tax refund case, the Commissioner's deficiency determination is presumptively correct, and the taxpayer has the burden of proving that such deficiency is erroneous." *Niles v. United States*, 710 F.2d 1391, 1393 (9th Cir. 1983). "The taxpayer not only has the burden of rebutting that presumption, but also of establishing entitlement to the specific amount of the deduction claimed." *Boddie-Noell Enters., Inc. v. U.S.*, 36 Fed. Cl. 722, 737 (1996).

### B. Section 1211

Internal Revenue Code ("I.R.C.") section 55(a) establishes the alternative minimum tax. A taxpayer's AMT liability, if any, "is the amount by which [his] tentative minimum tax exceeds [his] regular tax liability." *Ventas, Inc. v. U.S.*, 381 F.3d 1156, 1158 (Fed. Cir. 2004). "The AMT is

intended to prevent a taxpayer with substantial income from avoiding significant tax liability through the use of exemptions, deductions, and credits." *Pekar v. Commissioner*, 113 T.C. 158, 160 (Tax Ct. 1999). Norman argues that the Internal Revenue Service ("IRS") incorrectly applied I.R.C. section 1211 to his sale of ISO shares for the purposes of calculating his AMT. Section 1211 generally limits the regular tax capital loss deduction to no more than $3,000. *See* I.R.C. § 1211(b) ("in the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges plus (if losses exceed such gains) the lower of $3,000 . . . or the excess of such losses over such gains"). No statute nor regulation expressly states whether section 1211 applies to the sale of ISO stock that results in a negative AMT adjustment. However, in 2004, the IRS published a Notice entitled Frivolous Arguments to Avoid Concerning Statutory and Nonstatutory Stock Options. *See* IRS Notice 2004-28, 2004 WL 722655. The Notice explains that, under section 1211, "capital gains or losses occur upon the subsequent sale" of ISO shares and "[t]he same analysis applies for purposes of AMT . . . ." Similarly, in its briefing before this court, the IRS takes the position that section 1211 limits Norman's AMT capital losses. *See* Cross-Mot. Summ. J. at 7:1-2.

"[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Here, although the IRS has not promulgated a formal rule with respect to this precise issue, it has exercised its interpretative authority in two ways: by issuing the Notice and taking a litigation position. The IRS' view deserves deference. *See Esden v. Bank of Boston*, 229 F.3d 154, 169 (2d Cir. 2000) ("[a]lthough the IRS's guidance on how the existing regulatory framework applies to cash balance plans comes in a Notice, rather than in new regulations or a revenue ruling, such a consistent and reasonable interpretation by the responsible agency is entitled to deference, regardless of its form of publication"); *Auer v. Robbins*, 519 U.S. 452, 462 (1997) ("Petitioners complain that the Secretary's interpretation comes to us in the form of a legal brief; but that does not, in the circumstances of this case, make it unworthy of deference"). Where, as here, "Congress has not specifically addressed the question, a reviewing court must

respect the agency's construction of the statute so long as it is permissible." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

The method of calculating AMT income stemming from an ISO is uncontroversial when the sale of shares results in a positive AMT adjustment. The amount of AMT income depends on the stock price when a taxpayer exercises the option and when he sells the shares. *See* I.R.C. § 83 ("the excess of (1) the fair market value of [an ISO]" when it becomes transferable "over (2) the amount (if any) paid . . . shall be included in the gross income of the [taxpayer] in the first taxable year in which" the ISO becomes transferable). For example, suppose that, on January 1, 2001, a corporation grants an employee an ISO to purchase 1,000 shares at $10 per share. In February 2002, the stock is selling for $20 per share.[1] The employee exercises the ISOs. He does not recognize any regular taxable income in 2002 by doing so. However, in March 2003, he sells 1,000 shares at $30 per share. He incurs AMT income for 2002—the year in which he exercised the options—in the amount of $10,000: the difference between the fair market value of the shares when he exercised the ISOs in 2002 ($20,000) and the original option price in 2001 ($10,000). If his regular taxable income for 2002 is $200,000, the stock transaction raises his AMT income for that year to $210,000. In addition, this alters his AMT basis in the transferred stock to $20,000: the purchase price ($10,000) plus the amount of AMT income recognized on exercise ($10,000). His regular tax basis, however, remains the purchase price ($10,000). Thus, when he sells the shares in 2003 for $30,000, he recognizes a regular tax long-term capital gain of $20,000 ($30,000 minus the $10,000 purchase price). His capital gain for AMT purposes, however, is only $10,000: the amount realized by the sale ($30,000) minus the basis for AMT purposes ($20,000). If his regular taxable income in 2003 is $200,000 before the sale of the shares, his regular taxable income after the sale increases by his regular tax long-term capital gain of $20,000 and equals $220,000. Because his capital gain for AMT purposes is only $10,000 his AMT income for 2003 is only $210,000.

Here, however, Norman alleges that his sale of 85,398 Network ISOs in 2001 produced a *loss* for AMT purposes. If section 1211 applies to the sale of ISO shares that result in an AMT loss,

---

[1] These examples come from Lance W. Rook, *Tax Planning for the Alternative Minimum Tax* § 6.04[2] (2003).

it affects the total tax liability of individuals like Norman.[2]  For example, suppose an employee exercises an ISO to purchase stock for $5,000 in 2001 when the fair market value of the shares is $23,000.  The exercise of the ISO adjusts his AMT upward by $18,000.  His AMT basis is $23,000; his regular tax basis is $5,000.  In 2004, he sells the shares for $12,000.  He receives a regular tax capital gain of $7,000: the amount for which he sold the shares ($12,000) minus the option price ($5,000).  He receives an AMT capital loss of $11,000: his AMT basis ($23,000) minus the sale price ($12,000).  If section 1211 does not apply, he can reduce his AMT income by the full amount of his AMT capital loss ($11,000) minus his regular tax capital gain ($7,000), or $18,000.  Assuming that his regular taxable income in 2004 before sale of the shares is $300,000, his regular taxable income is $307,000 after the sale.  His AMT income would be $289,000: his regular taxable income ($307,000) minus his AMT adjustment ($18,000).  However if section 1211 does apply, it limits his capital loss deduction for AMT purposes for $3,000.  Thus, when he sells the shares in 2004, he receives a $3,000 deduction minus his regular tax gain of $7,000, for a total AMT deduction of $10,000.  His AMT income would be $297,000: his regular taxable income ($307,000) minus his AMT deduction ($10,000).

The court determines that the IRS' view of section 1211 is reasonable.  *See Merlo v. Commissioner*, 126 T.C. No. 10, 2006 U.S. Tax Ct. LEXIS 10, *14-15 (Apr. 25, 2006).  For one, it is axiomatic that "all Internal Revenue Code provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of the taxpayer."  20 C.F.R. § 1.55-1.  Because section 1211 governs Norman's calculation of his regular taxable income, it thus also presumably governs his calculation of his AMT.  In addition, commentary from the General Explanation of the Tax Reform Act of 1986 reveals that Congress specifically intended section 1211 to apply in these circumstances:

> In certain instances, the operation of the alternative minimum tax as a separate and independent tax system is set forth expressly in the Code . . . .  In other instances, however, *where no such express statement is made, Congress did not intend to imply that similar adjustments were not necessary.  Thus, for example, for minimium tax*

---

[2] The court uses a hypothetical example rather than facts specific to Norman for simplicity's sake.

> *purposes, it was intended that I.R.C. § 1211 (limiting capital losses) be computed using minimum tax basis . . . .*

General Explanation of the Tax Reform Act of 1986, 99th Cong. 2d Sess., 429-73 (emphasis added).

Norman correctly notes that the General Explanation, commonly known as the "Blue Book," is not part of the statute's official legislative history. Norman cites *Allen v. Commissioner*, 118 T.C. 1 (Tax Ct. 2002) for the proposition that the Blue Book has no persuasive value. In *Allen*, the Tax Court commented that while the 99th Congress passed the Tax Reform Act of 1986, the Joint Committee of Taxation for the 100th Congress wrote the Blue Book. *Id*. at *15. The court declined to adopt an interpretation based on the Blue Book, reasoning that it was an after-the-fact explication of legislative intent. *Id*. However, *Allen* involved a dispute over the meaning of "taxable income"—a term that Congress had "unambiguously" defined. *Id*. at *7. The court examined the Tax Reform Act of 1986's legislative history and the Blue Book for the sole purpose of ensuring that they did not contain "unequivocal evidence of a clear legislative intent" that "overr[o]de a plain meaning interpretation." *Id*. at *17. Here, the statute and its legislative intent are silent; the Blue Book is the sole piece of evidence on point.³ Moreover, the Ninth Circuit has expressly relied on the same Blue Book to uphold an IRS interpretation. *See Redlark v. Commissioner*, 141 F.3d 936, 941 (9th Cir. 1998) ("[w]hile such post-enactment explanations cannot properly be described as 'legislative history,' they are at least instructive as to the reasonableness of an agency's interpretation of a facially ambiguous statute"). To the extent that *Allen* and *Redlark* are inconsistent, this court is bound by *Redlark*. *See Hubbard v. U.S.*, 359 F. Supp. 2d 1123, 1127 n.5 (W.D. Wash. 2005) ("Except for *res judicata* issues, Tax Court precedent does not bind a United States District Court."). Thus, because the Blue Book suggests that section 1211 limits capital losses for AMT purposes, the court upholds the IRS' interpretation. *See Redlark*, 141 F.3d at 941 ("[i]n this case, the [G]eneral [E]xplanation clearly supports the Commissioner's interpretation").

---

³ The IRS also issued a Field Service Advisory that claims that "the Blue Book is competent authority, especially where there is no legislative history or statutory provision for guidance on an issue . . . because its authors are the committee staff which participates in every step of the legislative process." *See* IRS FSA, 1993 WL 1468073 (April 23, 1993). Although I.R.C. § 6110(k)(3) forbids courts from relying on a Field Service Advisory as precedent, a court still "may . . . deem[ ] it instructive." *Shaev v. Saper*, 320 F.3d 373, 381 n.5 (3d Cir. 2003).

Norman argues that he is entitled to an alternative tax net operating loss ("AT NOL") deduction under I.R.C. § 56(d)(2)(A)(i). *See* Rep. Supp. Mot. Summ. J. at 1:16-20. Norman contends that the IRS overlooks the fact that ISOs are a "tax adjustment item" under I.R.C. §§ 56 and 58 and not a "tax preference item" under I.R.C. § 57. A taxpayer must determine his AT NOL by making adjustments and deductions in accord with sections 58 and 57:

> Alternative tax net operating loss deduction defined.—
> ***
> [T]he net operating loss for . . . under section 172(c) shall—
> (i) be determined with the adjustments provided in this section and section 58, and
> (ii) be reduced by the items of tax preference determined under section 57 for such year.
> An item of tax preference shall be taken into account under clause (ii) only to the extent such item increased the amount of the net operating loss for the taxable year under section 172(c).

I.R.C. § 56(d)(2)(A)(i). Because tax preference items factor into the AT NOL calculation only to the extent they increase the amount of net operating loss, a tax preference item that does not increase a taxpayer's net operating loss does not affect his AT NOL. Under section 172(d)(4), Norman's sale of stock does not increase his net operating loss unless it resulted from his involvement in a "trade or business." *See Wang v. Commissioner*, T.C. Memo. 1998-389, 1998 WL 760936 (Tax Ct. 1998) ("[n]onbusiness expenses and losses are not included in NOL"). Because Norman offers no evidence that he sold his stock in connection with a trade or business, he cannot claim an AT NOL as a result of the sale.

Norman contends that "[a]lthough the [United States'] argument applies to tax preference items under I.R.C. § 57[, it] does not apply to this case because of a change in the tax law." Rep. Supp. Mot. Summ. J. at 14:6-9. Norman cites S. REP. 100-445, *96-97 for the proposition that "[i]n 1988, Congress categorized [ISOs] as a deferral preference item." That section provides:

> The bill provides that for purposes of the individual minimum tax, stock acquired pursuant to the exercise of an incentive stock option exercised after October 16, 1987, will be treated without regard to the rules of section 421. Instead the rules of section 83 will apply to the stock in determining the individual's alternative minimum taxable income. For example, if a taxpayer acquires stock pursuant to the exercise of an incentive stock option and disposes of the stock in the same taxable year, the tax treatment under the regular tax and the minimum tax will be the same; if the stock is disposed of in a disqualifying disposition in a subsequent taxable year, the 'spread' between the option price and fair market value of the stock (determined in accordance with the rules of section 83) will be included in alternative minimum taxable income in the first taxable year and in taxable income *(but not in alternative*

> *minimum taxable income) in the subsequent taxable year.* In addition, if the stock acquired is subject to a lapse restriction, amounts will be included in the alternative minimum taxable income in accordance with the rules of section 83. (For options exercised on or before October 16, 1987, and disposed of in a disqualifying disposition, the minimum tax treatment and the regular tax treatment will be the same for both the year of exercise and the year of disposition.)

Mot. Summ. J. at 3:20-4:11 (quoting S. REP. 100-445, *96-97) (emphasis added by Norman).

Norman also relies on language from the House Committee Report on the Omnibus Reconciliation Act of 1989:

> c. Incentive stock options
> Present Law
> Under present law, for purposes of the individual minimum tax, stock acquired pursuant to the exercise of an incentive stock option is treated without regard to the rules of section 421. Instead, the rules of section 83 apply.
> Explanation of Provision
> The bill clarifies that the minimum tax rules applicable to a disqualifying disposition of stock acquired pursuant to the exercise of an incentive stock option where the amount realized is less than the value at the time of exercise follows the regular tax rules of section 422A(c)(2) where the stock is disposed of in the same taxable year the income is taken into account for minimum tax purposes. *Thus the amount included in alternative minimum taxable income will not exceed the amount realized on the sale or exchange of the stock over the adjusted basis of the stock.*

*Id*. at 4:13-20 (quoting H.R. REP. 101-247, *1409) (emphasis supplied by Norman). However, Norman does not explain how either passage suggests that ISOs are no longer tax preference items. In any event, Tax Court precedent belies Norman's position. *See Speltz v. Commissioner*, 124 T.C. 165, 178 (Tax Ct. 2005) ("ISOs are treated as 'tax preference items' for AMT purposes in section 56(b)(3)").

Norman also attempts to cast the IRS' position as a retroactive change in the law. *See* Mot. Summ. J. at 7:6-10 ("[w]hen a well-known IRS administrative interpretation has been in effect for years and Congress has acted and reenacted tax statutes which d[o] not purport to modify the IRS' interpretation, Congress must be taken to have approved that interpretation"). Norman's support for this theory comes from the fact that the IRS issued instructions on Form 6251 from 1989 to 2000 that do not mention section 1211:

> Enter on line 9 [Form 6251] the difference between the gain or loss, if any, reported on the regular tax and that figured for the AMT. If (a) the AMT gain is less than the regular gain, (b) the AMT loss is more than the regular tax loss, or (c) you have an

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT—C-05-02059- RMW
DOH                                          8

> AMT loss and a regular tax gain (or no gain or loss for the regular tax), enter the difference as a negative amount.

Isaacson Decl. Supp. Mot. Summ. J. ("Issacson Decl.") Exs. E-M.  However, Norman explains, the IRS changed Form 6251 in 2001 expressly to state that section 1211 applies.  *See* Isaacson Decl. Exs. N-P ("Caution!  The $3,000 capital loss limitation for the regular tax applies *separately* for the AMT.").  Nevertheless, "[t]he authoritative sources of tax law . . . are statutes, regulations, and judicial decisions, and not instructions published by the Internal Revenue Service." *Crop Care Applicators, Inc. v. Commissioner*, T.C. Summ. Op. 2001-21, 2001 WL 1922019 (Tax Ct. 2001); *see also Zimmerman v. Commissioner*, 71 T.C. 367, 371 (Tax Ct. 1978) ("authoritative sources of Federal tax law are in the statutes, regulations, and judicial decisions and not . . . informal publications").  Norman's argument rests on the faulty premise that the IRS could commit itself to a position on whether section 1211 applies to the AMT capital loss deduction simply by failing to expressly mention section 1211 on form tax instructions.  Thus, it appears that the IRS began mentioning section 1211 on Form 6251 in 2001 to clarify that it applied, not to change the substantive law.

Finally, Norman advances several reasons why, in his view, applying section 1211 to cap AMT capital loss deduction stemming from the sale of an ISO is bad policy.  For example, Norman contends that "the result of capital loss treatment adds unnecessary complexity to the tax system." Rep. Supp. Mot. Summ. J. at 12:14-15.  Nevertheless, it is not this court's role to second-guess an agency's policy determinations:

> When a challenge to an agency's construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.

*Chevron*, 467 U.S. at 866.  Instead, the court must focus on whether the IRS' reading of the I.R.C. is reasonable.  As noted above, the court holds that the IRS' position in this case meets this standard. Norman's policy contentions are thus misplaced.[4]

---

[4]   In its cross-motion for summary judgment, the United States describes Norman's arguments as "incomprehensible and frivolous."  Cross-Mot. Summ. J. at 7:12.  In his reply brief, Norman objects to this language, and claims that the United States' contention that his "position is

## III.  ORDER

For the foregoing reasons, the court grants the United States' motion for summary judgment and denies Norman's motion for summary judgment.

DATED:      7/19/06

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

---

'frivolous' is beyond the bounds of any credible argument . . . [and] is in violation of [Federal Rule of Civil Procedure] 11."  Rep. Supp. Mot. Summ. J. at 4:2-5.  The court declines to treat this sentence as a formal request for Rule 11 sanctions because there is no indication that Norman has complied with Rule 11's safe harbor position.  Regardless, any such request lacks merit.

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

| | |
|---|---|
| Don Paul Badgley | donbadgley@badgleymullins.com |
| Brian G. Isaacson | briani@isaacsonlawfirm.com |
| Mark J. Wilson | courtnotices@badgleymullins.com |

**Counsel for Defendant:**

Jay R. Weill          jay.weill@usdoj.gov

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**        7/19/06                                    /s/ JH
                                                **Chambers of Judge Whyte**